# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JOHN DITULLIO,

     Petitioner,

v.                                Case No. 8:19-cv-813-VMC-MRM

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## ORDER

This cause is before the Court on Petitioner John DiTullio's timely amended petition for writ of habeas corpus under 28 U.S.C. § 2254 and supporting memorandum, which were filed by counsel. (Docs. 6 and 7.) Respondent opposes the amended petition. (Doc. 13.) DiTullio filed a reply to the response. (Doc. 16.) Upon consideration, the Court denies the amended petition.

## Procedural History

DiTullio was charged with first-degree murder of Kristopher King (count one) and attempted first-degree murder of Patricia Wells (count two). (Doc. 13-2, Ex. 2.) His first trial ended with a hung jury. (*Id.*, Ex. 3, p. 1094.) Upon retrial, DiTullio was convicted of first-degree murder on count one and the lesser-included offense of attempted second-degree murder on count two. (Doc. 13-6, Ex. 5.) The state court sentenced DiTullio to life in prison on count one and 15 years in prison on count two.

(*Id.*, Ex. 6.) The state appellate court *per curiam* affirmed the convictions and sentences. (*Id.*, Ex. 12). DiTullio filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Docs. 13-7 through 13-21, Ex. 22.) The state court struck some of the claims with leave to amend. (Doc. 13-22, Ex. 23.) DiTullio filed an amended motion. (*Id.*, Ex. 25.) The state court denied relief on all claims. (*Id.*, Ex. 26; Doc. 13-23, Ex. 29.) The state appellate court *per curiam* affirmed the denial of relief. (Doc. 13-23, Ex. 33.)

### Factual Background; Trial Testimony[1]

Patricia Wells, her son Brandon Wininger, and Wininger's friend Kristofer King lived in a trailer in Pasco County, Florida. Wells and Wininger moved into the trailer in December 2005 and King began staying there shortly before the offenses. On the night of March 22, 2006, when Wells and King were home, a man wearing a gas mask entered the trailer. Wells ran into the room where King was located and crouched down as the man stabbed her multiple times in the face, arms, and hands. When the man began stabbing King, Wells ran for help. A neighbor assisted her with calling 911. Meanwhile, the man stabbed King in the head, penetrating his skull and brain. The subsequent swelling in King's brain resulted in his death.

When police responded to the trailer, they observed a vehicle with slashed tires in the driveway, blood on the patio and driveway, and blood along the path that Wells took to get help. There was a spot of blood on the fence between Wells's trailer and

---

[1] This factual summary is derived from the trial transcript and appellate briefs.

the property next door. A police dog tracked from Wells's residence, over the fence, and to the trailer on the property next door. DiTullio lived there along with Shawn Plott, Brian Buckley, Cory Patnode, and John Berry.

DiTullio was a prospect trying to join an American Nazi group that the others were members of, and the property where they lived was described as a Nazi compound. Because DiTullio was a prospect, he would sometimes perform chores for the members. Prior to the offenses, some residents of the compound used racist and homophobic language towards Wells, whose African-American friend spent time at the trailer, and Wininger and King, who were gay. After Wells and Wininger moved in, windows were broken on their trailer and tires were slashed on their vehicles. A few weeks before the offenses, DiTullio and some others from the compound chased Wells and Wells's friend into her trailer. As Wells called 911, she heard DiTullio say, "I'm signing your death sentence," and "I'm going to kill you. [N*****]-lover. [F*****]-lover." (Doc. 13-4, Ex. 4, pp. 1087-88.)

Wells described the perpetrator as 5 feet, 10 inches to 6 feet tall, of medium build, with short blond hair, and wearing a white T-shirt and khaki pants. Wells stated that the attacker's height and build were consistent with those of DiTullio and did not match those of the other residents of the Nazi compound. Patnode and Berry also implicated DiTullio in the crimes.

Patnode and Berry both arrived at the compound in the afternoon to evening hours of March 22, 2006. Plott, Plott's girlfriend, and DiTullio were also there. Buckley was not present. Plott became very intoxicated and sometime after dark, he

had an argument with his girlfriend. DiTullio escorted Plott's girlfriend outside and out the gate to the compound. Patnode and Berry went outside and were talking in front of their trailer. Patnode heard the sound of tires being "popped" next door. (*Id.*, p. 1593.) Patnode believed that DiTullio was slashing tires. When Patnode and DiTullio were both back inside, Patnode got mad at DiTullio. Patnode did not want police to come because he was wanted for violation of probation.

At some point later, Patnode and Berry were talking outside. They both saw a woman running from the trailer next door and screaming. Patnode saw someone coming from the trailer next door wearing a gas mask. The person went over the fence and around the back of the compound. Although Patnode could not see the person's face because of the gas mask, he believed it was DiTullio based on the person's size.

When Patnode and Berry went back inside the trailer, Patnode saw DiTullio standing near the back door. Patnode believed DiTullio was holding a knife. DiTullio told Patnode that he had "killed them both" and stabbed them in the face. (*Id.*, pp. 1605-06.) Berry also heard DiTullio say that he had stabbed the neighbors. Berry ordered everyone to leave because the police would be arriving. Plott was passed out on a couch. Patnode kicked Plott to wake him up and said they had to leave. Patnode and Plott left together, and Berry and DiTullio left together in the opposite direction.

Berry and DiTullio went to Berry's friend's house. No one was home, so they returned to the compound. On the way there, DiTullio buried a knife in a yard. When they got back, DiTullio told Berry that he did not want to go to jail and was not going to be taken alive. Berry left the compound; he denied telling DiTullio to stay and

"shoot it out" with police. (*Id.*, p. 1767.) Later, between DiTullio's first and second trials, police asked Berry if he knew where the knife was, and Berry took them to the location where he believed the knife to be. Police found a knife buried near a well on the property.

Police surrounded the compound. Two officers were positioned under a white S.U.V. Police unsuccessfully used a public address system to try to get anyone inside the trailer to come out. Police forcibly entered the trailer at about 1:45 p.m. on March 23, 2006, and found DiTullio sitting on the couch next to three loaded firearms. Police saw fresh cuts and scratches on DiTullio's hands. Inside the trailer, a gas mask was hanging up, and a notebook was on the television. Inside the notebook was written:

> Fur mein bruders, I sit here alone with the Klan flag around my back watching these pigs try and figure out how they can take me out. I guess last night they wanted to go home to their wives, and today 9:45 a.m. I sit with three guns but only two hands. I'm ready to die for what I believe in. I know what it means to die for my race. I wish we could have had longer, but time is of the essence. The time is for action. I'm ready to shoot these cops until my hands stops [sic] working. Sneaky fucks, aren't they? Oh, well, where one brother falls another will rise from the shadows. I have faith in that. But I'd rather be killed than to live with those [n-******] forever. I love all of you.

(Doc. 13-4, Ex. 4, pp. 1281-82.) The paper was signed "Syn," a nickname DiTullio went by. (*Id.*) The back of the paper read:

> I see that it's not okay for me to go over to their house and exterminate them, but it's okay for the pigs to come in here and shoot me, two of them hiding under that white SUV. Hello motherfuckers, come and get some.

(*Id.*, p. 1282.) Several other writings by DiTullio were introduced at trial. A letter DiTullio wrote his to his father while he was in jail stated, in part:

> I hear you're upset about all this. All I can say is don't be. All of this is
> my fault. These are all my actions and I'm sick of fucking other people's
> lives up for the things that I have done. It's high time I stand up and face
> the music. No more hiding. I'm through running. . . .

(*Id.*, p. 1383.) DiTullio also sent a letter that resembled a Christmas card to the father

of victim Kristofer King. Respondent indicates that the card "is not listed on the trial

court docket, a copy of the card was not included in the direct appeal record, and

[counsel for Respondent] has been unable to obtain a copy of the card." (Doc. 13, p.

10 n.2.) Respondent also states that the card was introduced into evidence at trial, but

that the contents of the card were not read into evidence. (*Id.*, p. 10.) During opening

statements at the trial, the prosecutor indicated that the outside of the card said,

"Hoping your holidays are chock-full of Christmas cheer." (Doc. 13-4, Ex. 4, p. 1039.)

Inside the card, according to the prosecutor's statement, were the words, "Christmas

is a time to reflect and think about the people we miss. Hope your Christmas is full of

memories of your dead, gay son. Merry fucking Christmas, with happiness. Signed

Syn," followed by the words, "Bound to fry." (*Id.*)  DiTullio wrote a poem called "My

Life by Syn," which was inside a letter found after DiTullio's first trial. The poem was

published by the State during the second trial. A passage in the poem stated, "The

judges, the cops, don't know if it will ever stop. The knife, the well, the things I hid

well." (*Id.*, p. 1787.)

    Medical Examiner Jon Thogmartin testified that King's injuries could have

been caused by the recovered knife, and that the knife had damage consistent with

having penetrated King's skull. Blood on the gas mask matched Wells's DNA. A

"beanie," which may have been designed to be placed between the mask and wearer's face, contained a mixture of DNA samples. The major contributor was DiTullio. Other DNA was recovered from the gas mask, but the contributor of the DNA on the mask could not be determined.

Wells's DNA was also recovered on the outer portion of DiTullio's left boot. Forensic scientist Gerald Findley testified that it was impossible for blood drops left on the ground 13 hours before a person walked in that area to have transferred to the side of a shoe because the blood would be dry, and that any transfer of dry blood would be to the bottom of a shoe.

DiTullio testified at trial and denied stabbing the victims. DiTullio implicated Plott. DiTullio said that Wells's friend previously pulled a gun on Plott's girlfriend. DiTullio testified that on the night of the offenses, Plott went next door and returned "shaken" and "talking in riddles," holding something wrapped up in a sweatshirt. (Doc. 13-4, Ex. 4, pp. 2082-84.) DiTullio stated that his drink had been spiked with Xanax and that he was "trashed." (*Id.*, p. 2078.) DiTullio testified that Plott threw the gas mask at him and told him to hang it up. DiTullio stated that the others left and he passed out on the couch. When he woke up later, police were outside. He smoked marijuana, took Xanax, and went back to sleep. He woke up again when police entered the trailer. DiTullio stated that when officers walked him outside the police led him by the fence that separated the compound from Wells's property and he saw a large quantity of blood.

Craig Constantino, an inmate at the jail, testified for the State in rebuttal. Constantino testified that DiTullio asked for his help in gaining 30 to 40 pounds of muscle so that he would "outwit the description" of the attacker. (Doc. 13-5, Ex. 4, p. 1370.) Constantino testified that DiTullio said he was guilty and that he broke into a house and stabbed a woman and a child. Constantino testified that DiTullio said he was amazed by how easily a knife could penetrate a human skull and that he stabbed Wells because she was dating an African-American man. Constantino also testified that DiTullio attacked another inmate at the jail.

## Standard Of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on

a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed the denial of DiTullio's postconviction motion without discussion. This decision warrants deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a

relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S.Ct. 1188, 1192 (2018).

## **Exhaustion Of State Remedies; Procedural Default**

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates

prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

## Discussion

## I.   Procedurally Defaulted Grounds: Grounds Nine Through Twelve

### A.   Ground Nine

DiTullio argues that the trial court violated his federal rights to due process and a fair trial by overruling his objection to a juror's question. The trial court allowed jurors to submit questions of the witnesses.[2] Jurors submitted written questions to the judge, who reviewed the questions with the attorneys outside of the jury's hearing. The judge considered any objections in determining whether the proposed questions would be asked. One juror proposed a question to DiTullio that read, "Mr. DiTullio, do you still align yourself with Mr. Buckley or continue to share any beliefs of the American Nazis?" (Doc. 13-5, Ex. 4, p. 2279.) The state court overruled DiTullio's objection to the second part of this question as unduly prejudicial. (*Id.*, pp. 2279-80.)

Respondent contends that DiTullio failed to exhaust the federal nature of this claim on direct appeal. DiTullio counters that he did exhaust a federal claim because he stated, in the last sentence of his argument, that the alleged error violated his rights to due process and a fair trial under both the federal and state constitutions. (Doc. 13-6, Ex. 9, pp. 30-33.)

---

[2] *See Washington v. State*, 955 So.2d 1165, 1170 (Fla. 1st DCA 2007) ("Florida trial judges have discretion to allow jurors to submit questions to be asked of witnesses.").

DiTullio's federal claim is unexhausted. His minimal reference to federal law was insufficient to fairly present a federal claim to the state appellate court. *See Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) ("[F]or purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief."); *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (stating that, to have been "fairly presented" to the state courts, a claim must be brought in such a way "that a reasonable reader would understand [the] claim's particular legal basis and specific factual foundation" (quoting *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004))).

In *Baldwin v. Reese*, the Supreme Court stated that a petitioner can "indicate the federal basis for his claim" by citing the federal source of law in conjunction with the state law claim, citing a case deciding such a claim on federal grounds, or simply labeling the claim as "federal." 541 U.S. 27, 32 (2004). The Eleventh Circuit Court of Appeals has determined that this language was dicta and has held that more than a cursory reference to federal law is necessary to fairly present a federal claim:

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitions seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" *McNair*, 315 F.Supp.2d at 1184 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S.Ct 617, 620, 88 L.Ed.2d 598 (1986)). This is consistent with settled law established by the Supreme Court. *See Picard*, 404 U.S. at 275, 92 S.Ct. at 512 ("We emphasize that the federal claim must be fairly presented to the state courts."). We therefore hold that

> " '[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.' " *Kelley*, 377 F.3d at 1345 (quoting *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988)).

*McNair*, 416 F.3d at 1302-03.

DiTullio's single reference to his federal rights to due process and a fair trial, without more, was insufficient to alert the state court that he intended for it to review a federal claim. *See id*; *see also Ramos v. Sec'y, Dep't of Corr.*, 441 F. App'x 689, 696-97 (11th Cir. 2011) (holding that a petitioner failed to exhaust a federal claim when he only "made one passing reference" to his federal constitutional rights to due process and a fair trial, without arguing federal standards or citing federal case law).

Accordingly, Ground Nine is unexhausted. DiTullio cannot return to state court to exhaust a federal claim in state court in an untimely, successive direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within 30 days of the rendition of a sentence). Accordingly, the claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. DiTullio has not established that an exception applies to excuse the default. *See id*. He is not entitled to relief on Ground Nine.

## B.    Ground Ten

DiTullio contends that the trial court violated his federal due process and fair trial rights when it admitted into evidence the letter resembling a Christmas card that he sent to Kristopher King's father. Respondent argues that DiTullio failed to exhaust the federal nature of the claim on direct appeal. Similar to his argument in Ground Nine, DiTullio points out that he alleged in the concluding sentence of his argument

on appeal that the card's introduction violated both his federal and state constitutional rights to due process and a fair trial. (Doc. 13-6, Ex. 9, pp. 33-35.)

However, DiTullio's argument that the card was unduly prejudicial rested on state evidentiary law. (*Id.*) He made only one reference to the United States Constitution in the last sentence of his argument. (*Id.*, p. 35.) For the same reasons addressed in Ground Nine, DiTullio's presentation of the claim on appeal was insufficient to exhaust a federal claim in state court. *See McNair*, 416 F.3d at 1302-03; *Ramos*, 441 F. App'x at 696-97. Because DiTullio cannot return to state court to present the federal claim, the claim is procedurally defaulted. *See Smith*, 256 F.3d at 1138. DiTullio has not established that an exception applies to overcome the resulting procedural default. *See id.*  Ground Ten is therefore barred from review.

### C.    Ground Eleven

DiTullio contends that the trial court violated his federal rights to due process and a fair trial by admitting Craig Constantino's testimony that DiTullio attacked another detainee in the jail. The federal claim is barred from review for the same reasons as the claims presented in Grounds Nine and Ten. Again, DiTullio made a singular, unelaborated reference to his federal due process and fair trial rights on direct appeal. (Doc. 13-6, Ex. 9, pp. 37-41.) But the gravamen of his argument was that the trial court erred in determining under state evidentiary law that DiTullio opened the door to this testimony through his cross-examination of Constantino. (*Id.*) Accordingly, DiTullio did not exhaust a federal claim. *See McNair*, 416 F.3d at 1302-

03; *Ramos*, 441 F. App'x at 696-97. Nor does he establish that an exception applies to excuse the resulting procedural default. *See Smith*, 256 F.3d at 1138. Therefore, Ground Eleven is barred from federal habeas review.

### D.    Ground Twelve

DiTullio argues that the State's evidence was insufficient to support his convictions. He claims a violation of his federal due process rights. Respondent asserts that this claim is unexhausted because DiTullio did not present the federal nature of the claim to the state court on direct appeal. DiTullio contends that his federal claim is exhausted because "the argument that the prosecution failed to meet its burden of proving beyond a reasonable doubt that the defendant committed a crime" is particular enough to raise a federal due process claim. (Doc. 16, pp. 11-12.)

DiTullio's federal sufficiency of the evidence claim is unexhausted. In his appellate brief, DiTullio did not claim a violation of his federal constitutional rights, and did not address or cite any federal authority. (Doc. 13-6, Ex. 9, pp. 46-50.) Florida courts have utilized a unique standard of review when evaluating a challenge to the sufficiency of the evidence in a circumstantial evidence case. This standard provides that "[w]here the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 460 (11th Cir. 2015) (quoting *Thorp v. State*, 777 So.2d 385, 389 (Fla. 2000)). Florida's standard for circumstantial evidence cases "differs greatly" from the federal standard of review. *Preston*, 785 F.3d at 460. Under the Supreme Court's

decision in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), the federal standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational juror could have found proof of guilt beyond a reasonable doubt.

In his brief, DiTullio relied on *Ballard v. State*, 923 So.2d 475 (Fla. 2006), which applied Florida's special standard of review for circumstantial evidence cases. He did not identify or apply the *Jackson* standard. Because DiTullio relied upon Florida's circumstantial evidence standard and did not specifically assert a violation of his federal constitutional rights, he did not exhaust a federal claim on direct appeal.[3] *See Preston*, 785 F.3d at 462 (stating that the petitioner failed to exhaust a federal sufficiency of the evidence claim when he "relied on a unique rule of state law, 'cited exclusively to state cases, and all of his substantive arguments addressed Florida law'" because "[n]othing in [his] brief 'would have alerted the state court to the presence of a federal claim about due process.'" (quoting *Pearson v. Sec'y, Dep't of Corr.*, 273 F. App'x 847, 850 (11th Cir. 2008))).

DiTullio has not established that an exception applies to overcome the procedural default that results from the failure to exhaust his federal sufficiency of the evidence claim. *See Smith*, 256 F.3d at 1138. Accordingly, Ground Twelve is barred from federal habeas review.

---

[3] Florida has eliminated its distinct standard of review in circumstantial evidence cases and now follows the federal standard in all cases. *Bush v. State*, 295 So.3d 179 (Fla. 2020). However, Florida's circumstantial evidence standard was in effect at the time of DiTullio's trial and direct appeal.

## II.   Merits Review: Grounds One Through Eight

### A.   Standard For Ineffective Assistance Of Counsel Claims

In Grounds One through Eight, DiTullio alleges ineffective assistance of trial counsel. Ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

DiTullio must show that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, DiTullio must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."

*Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (stating that this doubly deferential standard of review "gives both the state court and the defense attorney the benefit of the doubt"). "The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

### B.   Ground One

DiTullio contends that trial counsel was ineffective in not calling Samantha Troupe. Troupe testified at DiTullio's first trial that Shawn Plott admitted to her that Plott committed the offenses. The state court denied DiTullio's ineffective assistance claim, explaining in detail that DiTullio told the trial court that he agreed with counsel's decision not to call Troupe and that he did not want any other witnesses called.

> The record reflects that this case was tried two times, with the first trial resulting in a hung jury. The Defendant claims that during the first trial, Ms. Troupe testified "that Shawn Plott had admitted to her that he committed the crimes, not [the Defendant]." The Defendant goes on to claim that "[a]t the second trial [his] counsel advised the Court that although [Ms.] Troupe was under subpoena, he did not intend to call her, because she . . . did not want to leave" her newborn child's side. According to the Defendant, even though this Court "suggested there might be some alternative to simply not calling [Ms.] Troupe," his counsel did not take the Court's suggestion, "but simply elected to proceed without [Ms.] Troupe." The Defendant claims that the attorney assisting him with the instant postconviction matter interviewed Ms. Troupe in preparation for the instant motion and Ms. Troupe indicated

that the Defendant's trial counsel "advised her that they could do without her but had she been told the defense had to have her, she would have come to testify." Finally, the Defendant claims that had his trial counsel called Ms. Troupe as a witness during his second trial, the outcome of the trial would have been different. . . .

Case law provides that if counsel conducts a reasonable investigation of a potential witness, the subsequent decision not to call such a witness is "virtually unchallengeable." *See Mendoza v. State*, 81 So.3d 579, 581 (Fla. 3d DCA 2012) (holding that if counsel has conducted a reasonable investigation, a defendant can rebut the presumption of reasonableness "only by establishing that '*no* competent counsel' would have made that same decision.") (quoting *Strickland*, 466 U.S. at 690). Once such a presumption arises, a defendant can only overcome it by showing that " '*no* competent counsel' would have made the same decision." *Id*. (quoting *White v. State*, 729 So.2d 909, 912 (Fla. 1999)) (emphasis in original).

In this case, the Defendant does not claim that the underlying investigation of this witness was unreasonable. Instead, the Defendant essentially "claims that trial counsel knew what [this witness] would testify to, and the failure to call the [witness] met *Strickland*'s two-prong requirements of constitutionally deficient performance and actual prejudice." *Mendoza*, 81 So.3d at 581. The Defendant should note that given the fact the underlying investigation of this witness was reasonable, the subsequent decision not to call Ms. Troupe as a witness, was a presumptively reasonable and strategic decision. *Id*. This presumption of reasonableness can only be overcome if the Defendant is able to demonstrate that no competent trial counsel would have made the same decision not to call Ms. Troupe as a witness. *Id*. Here, the record reflects that the Defendant agreed with counsel's decision not to call Ms. Troupe; therefore, his express agreement with the decision not to call Ms. Troupe is "fatal to his ineffective assistance of counsel claim." *Id*. Although the Defendant claims that counsel "simply elected to proceed without [Ms.] Troupe," again, the record reflects that this decision was made *with the consent of the Defendant*. The Defendant should note that "if [a] defendant consents to counsel's strategy, there is no merit to a claim of ineffective assistance of counsel." *See e.g.*, *Gamble v. State*, 877 So.2d 706, 714 (Fla. 2004). Here, the record reflects that the subject of Ms. Troupe's testimony was a topic that was discussed at length, throughout the trial. A topic that first arose when counsel for the Defendant was discussing the timeline

19

for the defense's case-in-chief, and advised the Court, in part, of the following:

> [COUNSEL]: ". . . Judge, I can tell you we had discussions about Samantha Troupe. I received a fax late last night, from All Children's Hospital [in] reference [to] the health condition of her baby. And I spoke with Samantha Troupe, in light of that and in light of other factors, *I've discussed with my client, John DiTullio*, the pros and cons of calling Samantha Troupe, and at this time it's our intent to not call her. And it's not going to change on Monday, her unavailability, she's under subpoena, we could get her here, but I don't think she's going to be very happy in light of her baby's circumstances. *But we've discussed all of it and it's our decision not to call her*.

Thereafter, the Court had the following exchange with the Defendant:

> THE COURT: Mr. DiTullio, two things. The first thing is there have been quite a number of witnesses called, sir, and has your lawyer failed to ask any witnesses any questions that you've instructed either of them to ask, and I'm pretty sure [co-counsel] at some point had some questions also today?

> DEFENDANT DITULLIO: No.

> THE COURT: Now, the next question is this, and I want to make it sort of a two-parter (sic). The first one is, *it is my understanding, after talking to your lawyer, that you-all have made a decision not to call Ms. Troupe, and that after that discussion with your lawyer, you believe that to be in your best interest; is that accurate*?

> DEFENDANT DITULLIO: Yes.

> THE COURT: Now, the second part of it is, at the last trial Ms. Troupe was, I think's accurate to say, a linchpin in your case, a fairly good witness for you, someone who would say that not only did you not commit this crime, but that she was present when someone else confessed to committing this crime. The other person who may fit the description of the perpetrator, at least the victim, who is still with us, Ms.

> Wells described, and the person who it would seem to me the Defense's theory where reasonable doubt is concerned, might fit the profile of the person who would create the reasonable doubt. So, because of that, with that understanding, you still agree not to call that witness?

> DEFENDANT DITULLIO: Right.

Subsequent to this exchange, the Court also advised the Defendant that Ms. Troupe's testimony "might be able to be used without her presence" and that she may "be able to be declared unavailable, and that declaration of unavailability might make her previous testimony admissible without her presence." Counsel indicted that he wanted more time to discuss the option of having Ms. Troupe declared "unavailable" with the Defendant and to determine whether Ms. Troupe's situation qualified her as "unavailable" under § 90.804, Fla. Stat. After the State's case-in-chief, counsel for the Defendant requested that the Court allow the defense "to introduce [Ms. Troupe's] former testimony in lieu of Samantha Troupe being there." The State objected to this request and argued that Ms. Troupe did not qualify as "unavailable" as that term is used in [§] 90.804. The record reflects that at some point, counsel for the Defendant acknowledged, correctly, that there was not a "sufficient basis" to declare Ms. Troupe unavailable. *See, e.g.*, *McClain v. State*, 411 So.2d 316 (Fla. 3d DCA 1982) (holding that hospitalization of witness's wife and his desire to be by her side was not a substantial basis for admitting witness's testimony from first trial). The record reflects further that Ms. Troupe was either unwilling or unable to leave her child's side and counsel ultimately decided to not pursue having her testimony entered under § 90.804, Fla. Stat. Despite the fact counsel decided not to pursue having Ms. Troupe declared as an unavailable witness, the record demonstrates that the Court was open to having a sheriff's deputy pick her up and bring her to court; however, counsel indicated that he wanted an opportunity to talk to Ms. Troupe again and if he was unable to change he[r] mind about testifying, he "didn't want to forcefully bring her in [to testify]." Although counsel declined to have Ms. Troupe forcibly brought in to testify, it is clear from the record that this is a course of action that the Defendant agreed with, which is confirmed by the following colloquy:

> THE COURT: Mr. DiTullio, I've been advised by your attorney that if it is the case that Samantha Troupe is not willing to come in to become a witness in this case, that you would not have the Court send the sheriff deputy out to get her and bring her in here; is that accurate?

> DEFENDANT DITULLIO: Yes.
>
> THE COURT: And after consulting with your lawyers, you believe that to be in your best interest?
>
> DEFENDANT DITULLIO: Absolutely.

Finally, before the defense rested its case, the Court also conducted the following colloquy with the Defendant:

> THE COURT: . . . Yesterday I was advised when I spoke to you, Mr. DiTullio, it would be the Defense's intent not to require the Court to send out a sheriff's deputy and pick up Ms. Troupe, and to rest without her testimony if she does not voluntarily make her way in here this morning. Is that still your position, sir?
>
> DEFENDANT DITULLIO: Yeah.
>
> THE COURT: Now, can I also ask this question, which is, at point [sic], have your lawyers called [all] of the witnesses that you've instructed them to call, or course, with the exception of Ms. Troupe?
>
> DEFENDANT DITULLIO: Right. Yeah.
>
> THE COURT: And have they asked all the questions of the State's witnesses and your witnesses that you asked them to ask up to this point?
>
> DEFENDANT DITULLIO: Yeah.
>
> THE COURT: Is there anything so far that they have failed to do at your request?
>
> DEFENDANT DITULLIO: No.

Based on the foregoing, the Court finds that it is clear that the Defendant consented to the strategy of not having Ms. Troupe called to testify at his second trial. The Defendant cannot now go behind sworn testimony and claim that he is dissatisfied with a trial strategy that he clearly agreed with and consented to at the time. Indeed, "*Strickland* stresses that '[a] fair

assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Gamble*, 877 So.2d at 715 (quoting *Strickland*, 466 U.S. at 689).

(Doc. 13-22, Ex. 26, pp. 6850-54) (state court's record citations omitted) (emphasis and some brackets in state court's order).

DiTullio has not established that the state court's resolution of the claim was objectively unreasonable. Initially, as the state court's order recognized, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995); *see also Blanco v. Singletary*, 943 F.2d 1477, 1495 (11th Cir. 1991) ("The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel.").

Counsel's strategic decisions "are entitled to a 'strong presumption' of reasonableness." *Dunn v. Reeves*, 141 S.Ct. 2405, 2410 (2021) (quoting *Richter*, 562 U.S. at 104); *see also Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020) ("Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices. . . . For Franks to prevail, then, he would have to show that *no* reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct."); *Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (stating that counsel's strategic decision "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would

have chosen it" even when the decision "appears to have been unwise in retrospect.") (quotation omitted).

DiTullio does not make this showing. Moreover, DiTullio agreed with the decision not to call Troupe. *See, e.g.*, *Hammond v. Hall*, 586 F.3d 1289, 1327-28 (11th Cir. 2009) (collecting cases that stand for the proposition that a strategic decision by defense counsel does not amount to ineffective assistance under *Strickland* when the defendant agrees with the decision); *Acuna v. United States*, 494 F. App'x 961, 962-63 (11th Cir. 2012) ("This Court has stated that ineffective assistance does not exist under *Strickland* where the defendant ultimately concurred in his counsel's tactical decision or strategy. . . . Acuna essentially waived his right to contest his counsel's ineffectiveness [for not calling certain witnesses] by agreeing with that choice at trial."). DiTullio's sworn statements to the trial court are presumed to be correct. *Cf. Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977) (stating in the context of a plea colloquy that a defendant's representations "constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity").

DiTullio does not show that the state court unreasonably denied his ineffective assistance claim based on his agreement with counsel's presumptively reasonable strategic choice not to call Troupe. Because DiTullio does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, he is not entitled to relief on Ground One.

## C.    Ground Two

24

DiTullio argues that trial counsel was ineffective in not adequately challenging the State's DNA evidence. He states that counsel retained a DNA expert to assist counsel in preparing to cross-examine the State's DNA expert. But DiTullio argues that counsel should have called the defense expert to testify about concerns with contamination of the DNA evidence and to emphasize both the absence of the victims' DNA on the bottom of DiTullio's boots and the absence of DiTullio's DNA on the inside of the gas mask.

The state court denied DiTullio's claim. After setting out the arguments presented by DiTullio and the State, the Court began its analysis with DiTullio's representations to the trial court that his attorneys called all the witnesses he wanted them to call.

> [A]s the State aptly points out, the Defendant's own sworn statements to this Court reflect an attempt to go behind sworn representations previously made to this Court. Certainly, the Court recognizes the Defendant's argument, that a relevant consideration is whether counsel provided advice that was unreasonable; however, the Court cannot ignore the fact that this is not a case concerning a general acquiescence to counsel's trial strategy. Meaning, the Defendant did not merely express satisfaction with his attorney's performance, he, under oath, specifically affirmed that there were no witnesses he wished to call. . . . To be sure, the record here reflects that the Court made a very specific inquiry with the Defendant on the subject of defense witnesses, asking him, again, quite specifically, whether his attorneys had "*called (sic) of the witnesses that [he had] instructed them to call*," to which, the Defendant responded, "Right. Yeah." Again, the Defendant affirmed, under oath, that he did not wish to call any other witnesses. . . .
>
> Furthermore, the Defendant's affirmation that counsel had called all of the witnesses that he wanted called, was not made blindly. It is clear, by virtue of the Defendant's own sworn statement in his motion that this expert was retained by counsel "to assist him in the cross examination of the State's DNA expert," that he was in fact aware of this witness. The

essence of the Defendant's complaint is that counsel failed to utilize this expert in the correct manner; however, the fact remains that when the Defendant provided sworn statements to this Court that his attorneys had called all of the witnesses that he wanted to have called, he was aware of not only the existence of this . . . expert but, he was also aware of the fact that this witness had not been called during the trial. It is in hindsight, that the Defendant now complains that this expert, that he was acutely aware of, was not utilized correctly. However, the Defendant cannot now claim that counsel was ineffective for failing to call this witness, when he indicated, under oath, that counsel had called all of the witnesses he wished to have called. *See Terrell v. State*, 9 So.3d 1284, 1288-89 (Fla. 4th DCA 2009) (defendant was bound by his answers to the court's colloquy that he did not want to call any witnesses, defeating his claim that his counsel failed to investigate and call a witness known to the defendant prior to trial). . . .

In his reply, the Defendant argues that the State improperly focuses on whether the Defendant, a "non-lawyer," agreed to the advice of his attorney, when, according to the Defendant, the relevant consideration is whether the "advice and strategy [was] reasonable or not." While this is a compelling argument, the Court notes that even if it were to find that counsel was deficient for failing to utilize the retained defense expert as an actual witness for the defense, the Defendant still cannot demonstrate that he was prejudiced by this failure. . . . [W]hat the Defendant has failed to acknowledge is that this very same information was in fact presented to the jury. The Court will address the testimony the Defendant claims this expert would have offered, in turn.

**Calling a defense DNA expert as a witness to "cast doubt on the reliability of the State's expert's conclusions, in particular the troubling contamination issues. . . ."**

A review of the record reveals that during the trial, counsel for the Defendant, cross-examined the State's expert witness on the reliability, or lack thereof, of her expert conclusions and focused, quite heavily on the "troubling contamination issues" the Defendant makes mention of in the instant motion. In fact, the subject of "a contamination event" that occurred during the process of this expert's examination of the evidence in this case, was discussed at length when the State's DNA expert, Ms. Janel Borries, testified during the trial. To that end, at trial, counsel focused on issues surrounding . . . the issue of contamination, cross-examining Ms. Borries on this issue and arguing during closing arguments that this contamination amounted to reasonable doubt. The

Court would also note that it is clear from the record that the jury noticed the significance of this contamination issue, which is evidenced by the jury's follow-up questions posed to Ms. Borries. Six of the eight follow-up questions posed by the jury, focused on the issue of contamination. Furthermore, counsel capitalized on the revelation of this contamination issue and brought it out on several occasions during his closing argument. Simply put, the very same "troubling contamination issue" the Defendant claims only this expert could have presented to the jury, was in fact presented through another witness, the jury recognized its significance, and counsel argued to the jury that the contamination issue amounted to reasonable doubt.

Prejudice is described as a "finding that the deficient performance put the whole case in such a different light as to undermine the court's confidence in the outcome of the proceeding." *Hill v. State*, 788 So.2d 315, 319 (Fla. 1st DCA 2001). Here, the record demonstrates that although the defense did not call its own expert, counsel for the Defendant was able to do the very same thing the Defendant claims an expert called on the behalf of the defense would have done, to wit: "cast doubt on the reliability of the State's expert's conclusions, in particular the troubling contamination issues." The Defendant has failed to demonstrate that he was prejudiced by counsel's failure to call a defense DNA expert. *See Carmona v. State*, 814 So.2d 481, 482-83 (Fla. 5th Dist. App. 2002) (finding that "*[e]ven if defense counsel was unreasonable in failing to call expert witness to testify regarding defendant's blood alcohol level at time of accident, defendant failed to show prejudice . . . where jury heard state's expert testify that defendant's blood alcohol level may have been negligible. . .*") . . . *see also Abdool v. State*, 220 So.3d 1106, 1114-15 (Fla. 2017), *reh'g denied*, SC14-2039, 2017 WL 2376622 (Fla. June 1, 2017) (finding that "because the expert [the Defendant] faults trial counsel for failing to consult and retain actually provided information that is consistent with the testimony presented by the State's arson expert, there is no prejudice."); *See Rimmer v. State*, 59 So.3d 763, 777 (Fla. 2010) ("Because counsel conducted an effective cross-examination of the eyewitnesses and consistently attacked the eyewitness identifications and the process of making those identifications, [the defendant] has not demonstrated that he was prejudiced by counsel's failure to obtain an eyewitness identification expert.").

**Calling a defense DNA expert as a witness "for the purpose of emphasizing the lack of DNA evidence against [the Defendant], in particular, the significance of the lack of victim DNA evidence on the**

**bottom of the boots and lack of [the Defendant's] DNA inside of the gas mask"**

Again, the record reflects that despite the fact a defense DNA expert was not called, counsel for the Defendant was still able to elicit testimony from the State's DNA expert concerning the alleged lack of victim DNA evidence on the bottom of the boots and the alleged lack of DNA evidence against the Defendant on the inside of the gas mask.

First, as to the DNA evidence of the victim, or lack thereof, on the boots, the record reflects that during the direct-examination of Ms. Borries, the State, through its own DNA expert, brought out the fact that there was "a lack of victim DNA evidence on the bottom of the boots." Furthermore, counsel effectively cross-examined Ms. Borries on the issue of what the Defendant characterizes as the "lack of DNA evidence against [the Defendant]" as it relates to the boots. As to the gas mask, the State, through its own DNA expert, brought out the fact that there was a "lack of [the Defendant's] DNA inside of the gas mask." Finally, during closing argument, counsel for the Defendant presented arguments on these very same points to the jury.

The Defendant has failed to demonstrate that he was prejudiced by the failure of counsel to call this expert to testify on these two points. Not only did the Defendant affirm, under oath, that he did not wish to have any other witnesses called on his behalf, but the Court finds that, even in the absence of this expert, counsel for the Defendant was able to elicit the very same testimony he claims this expert would have provided. He was therefore not prejudiced, even in the absence of this expert testimony.

(Doc. 13-23, Ex. 29, pp. 7141-45) (state court's record citations omitted) (emphasis and brackets in state court's order).

DiTullio has not carried his burden of showing that the state court's denial of his claim was objectively unreasonable. First, he does not show that the state court unreasonably determined that he failed to establish counsel's deficient performance under *Strickland*'s first prong. Counsel's decision not to call the defense DNA expert as a witness was a presumptively reasonable strategic decision, and DiTullio agreed

that he did not want counsel to call other witnesses. *See Hammond*, 586 F.3d at 1327-28; *Acuna*, 494 F. App'x at 962-63.

Moreover, DiTullio has not shown that the state court unreasonably found that he did not show prejudice under *Strickland*. The substance of an expert's prospective testimony was placed before the jury, as described in the state court's comprehensive order. The State's expert testified to a contamination event, as well as the DNA evidence on the boots and gas mask, and counsel stressed these matters during his cross-examination of the State's expert. (Doc. 13-4, Ex. 4, pp. 1425-63, 1469-81.) Counsel pointed to these DNA issues in arguing that the State had not met its burden of proof. (Doc. 13-5, Ex. 4, pp. 2603-06.) Further, as the state court noted, the jurors' questions for the State's expert show that they were well aware of the concerns with DNA contamination. (Doc. 13-4, Ex. 4, pp. 1487-91.) Therefore, the record supports the state court's conclusion that the DNA issues were already presented to the jury. DiTullio does not show a reasonable probability of a different outcome at trial had counsel called the defense DNA expert.

As DiTullio does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts when it denied his ineffective assistance claim, he is not entitled to relief on Ground Two.

### D.    Ground Three

DiTullio alleges that trial counsel was ineffective in failing to call a "white gang expert/specialist" to testify that the Nazi group would not have called upon DiTullio to commit these offenses because he was merely a "prospect." DiTullio alleges that

counsel retained an "expert/specialist in white gang behaviors" before trial. (Doc. 6, p. 8.) The state court denied DiTullio's ineffective assistance claim. After addressing the postconviction pleadings in detail, the state court found:

> [T]he Court finds that the Defendant's claim is refuted by his sworn statement during the colloquy that he did not wish to call any other witnesses. The Defendant should note that contrary to his suggestion that case law does not support the State's position this point, the case law on this matter is very clear. *See Terrell*, 9 So.3d at 1289 (finding that the failure to call an expert to testify at trial did not constitute ineffective assistance of counsel, "where colloquy conducted by the trial court showed that defendant did not want to call any other witnesses."). To be sure, there was nothing generalized about the colloquy the Court conducted with the Defendant. *Cf. Gutierrez v. State*, 27 So.3d 192, 195 (Fla. 5th Dist. Ct. App. 2010) (noting that the "record [did] not refute [defendant's] claim because he either was not given the opportunity to indicate he wanted another witness called, or may have thought it was too late to so inform the trial court."). Given the fact, the Defendant has admitted that he was aware of this white gang specialist, he certainly had an opportunity to inform the Court that he wished to call said specialist when he was specifically asked whether his attorneys had "*called (sic) of the witnesses that [he had] instructed them to call.*" Instead, he affirmed, again, under oath, that he did not want to call any other witnesses.
>
> Furthermore, the Court finds that, as the State points out, even if this Court were to ignore the colloquy where the Defendant affirmed that he did not want to call any other witnesses, he still cannot demonstrate that he was prejudiced. The Defendant claims that a gang specialist would have testified that the Defendant, as a "non-member and only a prospect to join the Nazi gang," would not have been tasked with or even permitted to do the crimes with which he was charged. However, as the State suggests, the testimony the Defendant claims this white gang specialist would have given, would not have rebutted the State's prevailing argument, which was that the Defendant, without direction and fueled by intense hatred for the victims, killed one and attempted to kill the other. The Defendant characterizes the proposed testimony from this white gang specialist as "essential," but again, the testimony, as outlined by the Defendant, would have done nothing to discount the State's theory that the Defendant committed these crimes on his own volition. The Court would also note that during closing arguments, the State even *discounted* the possibility that John Berry directed the

Defendant to stay in the house and take the blame for the crimes. The Defendant cannot demonstrate that he was prejudiced by the omission of testimony that would have only gone to refute a theory of the Defendant's guilt (i.e. that he was directed to commit the crime), *that was never in fact put before the jury*.

Not only did the Defendant affirm, under oath, that he did not wish to have any other witnesses called on his behalf, but the Court finds that the testimony that the Defendant complains of, would have wholly failed to refute the State's actual theory that the Defendant committed the crime, independently and without direction. He was therefore not prejudiced, even in the absence of this expert testimony.

(Doc. 13-23, Ex. 29, pp. 7147-48) (state court's record citations omitted) (emphasis and brackets in state court's order).

DiTullio has not shown that the state court unreasonably applied *Strickland* in denying his claim. As addressed above, DiTullio told the trial court that he did not want additional witnesses called, thereby agreeing with counsel's presumptively reasonable strategic decision not to call other witnesses. Under these circumstances, DiTullio fails to show that the state court unreasonably determined that counsel did not perform deficiently. *See Hammond*, 586 F.3d at 1327-28; *Acuna*, 494 F. App'x at 962-63.

Nor does DiTullio show that the state court unreasonably found that DiTullio failed to show *Strickland* prejudice. As the state court pointed out, the prosecution argued that DiTullio committed the offenses on his own—not that he was directed to commit them because he was a Nazi prospect. The prosecution's opening statement suggested that when DiTullio committed the offenses, the others he lived with at the compound were not directly involved, and made no mention of DiTullio's being

directed to commit the offenses. (Doc. 13-4, Ex. 4, pp. 1043-46.) The prosecution asserted that the evidence would show Patnode told DiTullio he did not want the police to come when he suspected DiTullio punctured vehicle tires the night of the crimes, that Berry directed everyone to leave the compound when DiTullio stated he stabbed the neighbors, and that Berry later left when DiTullio suggested he was going to stay and fight the police. (*Id*.)

Similarly, during closing arguments, the prosecutor did not argue that the other individuals from the compound directed or encouraged DiTullio to commit the offenses. (Doc. 13-5, Ex. 4, pp. 2582-89.) Rather, the prosecutor asserted that DiTullio committed the offenses on his own, noted that DiTullio admitted a hatred of African-Americans, and asserted that DiTullio was motivated to impress the group members. (*Id.*, pp. 2582-89, 2648-49.) The prosecutor again recounted Patnode's and Berry's reactions after the tires were punctured and after DiTullio admitted the crimes. (*Id.*, pp. 2582-89.)

DiTullio does not show that the state court unreasonably applied *Strickland* or that its decision was based on an unreasonable factual determination. He is not entitled to relief on Ground Three.

### E.    Ground Four

DiTullio argues that trial counsel was ineffective in not calling a forensic crime scene expert to testify about the lack of incriminating blood spatter evidence. The state court denied this ineffective assistance claim:

[T]he Defendant claims counsel was ineffective for "failing to present the testimony of a forensic crime scene expert to challenge the lack of blood spatter evidence tying [the Defendant] to the crime." According to the Defendant, "[t]he crime scene was a bloody mess;" however, "none of [the Defendant's] blood was found at the crime scene and no victim blood was found on any of [the Defendant's] clothing, nor on the bottom of [his] boots, nor on [his] hands." The Defendant claims that this case "required a defense forensic crime scene and blood expert to explain to the jury . . . the significance of this evidence, the sum of which is that it proves that [the Defendant] could not have committed this crime." According to the Defendant, if counsel had presented a defense forensic crime scene and blood expert to explain the significance of the aforementioned evidence, or lack thereof, the outcome of the trial would have been different.

. . .

The Court continues to find that the Defendant cannot demonstrate that counsel was ineffective for failing to call this witness, when he affirmed, under oath that he did not wish to have any other witnesses called. *See Terrell*, 9 So.3d at 1289 (finding that the failure to call an expert to testify at trial did not constitute ineffective assistance of counsel, "where colloquy conducted by the trial court showed that the defendant did not want to call any other witnesses."); *Cf. Gutierrez*, 27 So.3d at 195 (noting that the "record did not refute [defendant's] claim because he either was not given the opportunity to indicate he wanted another witness called, or may have thought it was too late to so inform the trial court.").

Notwithstanding the foregoing, even if the court were to find that counsel was deficient in failing to call "a forensic crime scene expert to challenge the lack of blood spatter evidence tying [the Defendant] to the crime," the Defendant has failed to show that he was prejudiced by this failure. The Defendant contends that this expert would have been able to explain the significance of the fact that despite the fact the crime scene was a "bloody mess . . . none of [his] blood was found at the crime scene and no victim blood was found on any of [his] clothing, nor on the bottom of [his] boots, nor on [his] hands." While the Defendant claims an expert would have been the only way for the jury to understand the significance of the alleged limited amount of blood actually found on the Defendant or his clothes, the record reflects that the jury heard this information during the course of the trial.

The Defendant focuses on the fact that "no victim blood was found on any of [his] clothing, nor on the bottom of [his] boots, nor on [his] hands;" however, from the beginning, in opening statements, the jury heard from the State that the victim's DNA was only found on two items: 1) the outside portion of the Defendant's left boot, and 2) the front of the gas mask. To that end, as to the lack of victim blood on the Defendant's clothing, the State's DNA expert from the Florida Department of Law Enforcement, Ms. Borries, acknowledged that there was no victim blood found on any of the Defendant's clothing, which included the vest, t-shirt, and pants he was wearing when arrested. The State also called another forensic DNA expert, Huma Nasir, who acknowledged that, as to the vest the Defendant has on when he was arrested, none of the victim's DNA was found.

The Defendant also focuses on the fact that there was no victim blood found on the bottom of his boots; however, this was a point that was in fact presented the jury. Indeed, on this point, Ms. Borries' testimony concerning the presence of the victim's blood on the boots was limited to her findings related the *outer portion of the Defendant's left boot*. Meaning, there was no testimony that the victim's blood was found on the *bottom* of the Defendant's boots. To that end, Ms. Nasir also confirmed during her direct-examination, albeit indirectly, that there was no victim blood found on the bottom of the Defendant's boots. As to the lack of victim blood found on the Defendant's hands, Detective Seltzer testified that he observed what he considered recent scratches and minor cuts on the Defendant's hands; however, there was no testimony that there was blood found on the Defendant's hands.

The Defendant alleges that only a "forensic crime scene expert" could have effectively "challenge[d] the lack of blood spatter evidence tying [the Defendant] to the crime;" however, the record reflects that counsel for the Defendant did just that and effectively cross-examined the State's blood spatter expert on this every subject. Again, the record reflects that the evidence adduced at trial revealed that the victim's DNA was only found on two items: 1) the outside portion of the Defendant's left boot, and 2) the front of the gas mask. In reviewing the record, it is clear that the defense was attempting to demonstrate that the victim DNA that was in fact found on these two items, only got there by some mistake or transfer that occurred independent of the crime scene and not because the Defendant was actually the perpetrator of the crime. In essence, the defense was challenging, "the lack of blood spatter evidence tying [the Defendant] to the crime."

The Court also finds that the jury was able to understand the significance of the blood evidence, or lack thereof, in this case. The State points this Court's attention to the fact that the jurors asked well-informed questions of several witnesses concerning the blood evidence in this case, in support of its argument that an expert was not needed for the jury to understand the blood evidence in this case. The Court agrees. The questions from the jurors that the State points this Court's attention to, indicate that these questions were well informed and demonstrate that the jurors not only understood the significance of the evidence, or lack thereof, but also that they understood the significance of the defense's suggestion that the Defendant only got the victim's blood on the outside portion of his shoe, by virtue of some inadvertent transfer when he was walked through an area that contained the victim's blood. The import of this is that even in the absence of this expert the Defendant complains of, the defense was able to "challenge the lack of blood spatter evidence tying [the Defendant] to the crime." Regardless of whether the jury actually found credence in the defense's argument or theory on this point, the Court would note that the defense was in fact able to seize an opportunity to point out that questions were raised during the course of the trial, relevant to its theory that the transfer of the victim's blood on the Defendant's left boot, occurred inadvertently. Counsel for the Defendant used this as a segue to discuss what it considered the lack of blood evidence linking the Defendant to the crime, and in doing so pointed out the jury the following: 1) none of the evidence from the victim's home had the Defendant's DNA on it; 2) if there was a struggle, the Defendant would have had fresh injuries, but that the pictures admitted into evidence, depicted old injuries; 3) if, as the State claimed, the Defendant had washed in hands to get rid of blood evidence, his hands would have looked cleaner, but that the pictures admitted into evidence, depicted dirty hands that did not look as though they had been washed; 4) along the same lines, there was no evidence in the Nazi compound that suggested the Defendant has cleaned off any blood, and; 5) if the Defendant had committed this crime "he would be covered in blood," but that again, the evidence did not support such a finding. All of these arguments are a "challenge [to] the lack of blood spatter evidence tying [the Defendant] to the crime."

Not only did the Defendant affirm, under oath, that he did not wish to have any other witnesses called on his behalf, but the Court finds that, even in the absence of this expert, counsel for the Defendant was able to effectively "explain to the jury . . . the significance of [the lack of blood] evidence, the sum of which is that it proves that [the Defendant] could not have committed this crime." *See Carmona*, 814 So.2d at 482-83

(finding that "[e]ven if defense counsel was unreasonable in failing to call expert witness to testify regarding defendant's blood alcohol level at time of accident, defendant failed to show prejudice . . . where jury heard state's expert testify that defendant's blood alcohol level may have been negligible . . ."); *see also Abdool*, 220 So.3d at 1114-15, *reh'g denied*, SC14-2039, 2017 WL 2376622 (Fla. June 1, 2017) (finding that "because the expert [the Defendant] faults trial counsel for failing to consult and retain actually provided information that is consistent with the testimony presented by the State's arson expert, there is no prejudice."); *Rimmer*, 59 So.3d at 777 ("Because counsel conducted an effective cross-examination of the eyewitnesses and consistently attacked the eyewitness identifications and the process of making those identifications, [the defendant] has not demonstrated that he was prejudiced by counsel's failure to obtain an eyewitness identification expert.").

(Doc. 13-23, Ex. 29, pp. 7148-53) (state court's record citations omitted) (emphasis and brackets in state court's order).

DiTullio has not shown that relief is warranted based on the state court's resolution of this claim. Again, whether to call a witness is a strategic decision and therefore presumed reasonable. *See Dunn*, 141 S.Ct. at 2410. DiTullio agreed with counsel's decisions as to which witnesses to call, and does not show that counsel performed deficiently in not calling a witness regarding the blood spatter evidence. *See Hammond*, 586 F.3d at 1327-28; *Acuna*, 494 F. App'x at 962-63.

Further, the state court reasonably determined that DiTullio failed to show prejudice. The jury heard that Well's blood was found on one area on the side of DiTullio's left boot and that DiTullio's clothing did not have foreign DNA. (Doc. 13-4, Ex. 4, pp. 1421-24, 1812-13.) The jury asked questions about blood and DNA evidence, including questions going to whether the blood on DiTullio's boot could have gotten there when police led him out of the trailer. (*Id.*, pp. 1306-08, 1318, 1348-

49.) Additionally, defense counsel argued about the lack of blood evidence. He asserted that, while police testified to seeing what appeared to be fresh cuts on DiTullio's hands, none of DiTullio's DNA was found on the scene and noted the lack of blood on DiTullio. (Doc. 13-5, Ex. 4, pp. 2618-21.) Counsel also argued that while the State suggested DiTullio had time to clean up any blood before his arrest, the pictures of his hands showed that his hands were dirty, and police found no evidence in the trailer that someone had cleaned up blood. (*Id.*) DiTullio does not show a reasonable probability of a different outcome had a defense expert been called to testify to the lack of blood evidence in light of the evidence and argument presented to the jury.

Further, unlike his other claims of ineffective assistance of counsel for failure to call witnesses discussed above, DiTullio does not identify the prospective witness or claim that counsel had indeed retained such a prospective witness. His claim is therefore too speculative to warrant federal habeas relief. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful. This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'" (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985))); *see also Shaw v. United States*, 729 F. App'x 757, 759 (11th Cir. 2018) (stating that claims about uncalled witnesses are not favored because "allegations of what a witness would have testified are largely speculative") (citation omitted); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a

petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim).

DiTullio does not establish that the state court's resolution of his claim involved an unreasonable application of *Strickland*. Nor does he show that it was based on an unreasonable factual determination. Therefore, DiTullio is not entitled to relief on Ground Four.

### F.    Ground Five

DiTullio argues that trial counsel was ineffective in failing to document and photograph the crime scene to show that Patnode and Berry could not have observed him run from the scene, as they testified, because the door to Wells's trailer was not visible from their vantage point. The state court denied this claim:

> [T]he Defendant claims counsel was ineffective for "failing to examine the crime scene and conduct and photograph and diagram the scene." According to the Defendant, had counsel examined the crime scene, he would have been able to establish that the testimony of two witnesses, Cory Patnode and John Berry, was false. Specifically, the Defendant claims that Mr. Patnode and Mr. Berry testified "that they witnessed [the Defendant] running out of the door of the victims' home[,] around the back of the home[,] then across to the so-called Nazi compound" and that "they were standing at the gate of the Nazi compound when they witnessed this." However, according to the Defendant, "this was physically impossible," because "[t]he door to the victims' home faced on the opposite side of the property such that from the gate of the Nazi compound you could not see the door to the victims' home." The Defendant argues that "documentation" of the crime scene would have established the falsity of these witnesses' claims and said documentation could have been "demonstrated at trial." The Defendant claims that since these were the only witnesses that could place the Defendant at the scene of the crime, the documentation was "crucial" and but-for counsel's failure to present this evidence during the trial, the outcome of the trial would have been different. . . .

At the outset, the Court notes that the record supports the Defendant's claim that during direct-examination, Mr. Patnode testified that on the day the incident at hand occurred, he saw someone, who he assumed to be the Defendant, running out of the victim's home, back toward the Nazi compound. However, the record refutes the Defendant's claim that counsel failed to establish that based on the place Mr. Patnode claims he was standing at the time, it was "physically impossible" for him to see the Defendant run from the victim's home. In fact, the record reflects that the layout of the Nazi compound, its relation to the victim's home, and where Mr. Patnode and Mr. Berry were standing on the evening the incident occurred, was in fact established during the course of the trial. To that end, during cross-examination, counsel for the Defendant asked Mr. Patnode the following questions:

> Q. Now, you say it's [the Defendant], that you saw him coming from Patricia Wells' home, right?
>
> A. Yeah.
>
> Q. You were with John Berry at the time?
>
> A. Yes.
>
> Q. Were you standing by the fire pit at the time?
>
> A. I can't remember. I don't know if there was a fire going or not.
>
> Q. No, but the fire pit?
>
> A. Yes.
>
> Q. Outside the front –
>
> A. Yes.
>
> Q. –of your house you had a fire pit, right?
>
> A. Yes, sir.
>
> Q. Were you standing by the fire pit?
>
> A. Yes, sir.

Q. Do you know if there was a fire going?

A. I can't remember.

Q. Okay. And you were standing there talking to John Berry?

A. Yes, sir.

Q. *And you would agree from the fire pit area it's impossible to see the front door of Patricia Wells' single-wide mobile home, right?*

A. *Yes, sir.*

Based on the foregoing, it is clear that counsel did in fact establish that it was "physically impossible" for Mr. Patnode to see the Defendant come from the victim's home from the place Mr. Patnode claims he was standing at the time. Therefore, the Defendant has failed to demonstrate that counsel was deficient as it relates to refuting Mr. Berry's [sic] testimony that he witnessed the Defendant running from the victim's home the day the incident occurred.

The record also refutes the Defendant's claim that counsel allowed John Berry's testimony to go unchallenged. At the outset, the Court notes that based on its review of the trial transcript, Mr. Berry never indicated during his testimony at the second trial, that he "witnessed [the Defendant] running out of the door of the victims' home." Mr. Berry did however testify that while he was standing by the fire pit, he witnessed one of the victims, Patricia Wells, running out of her home, across the street screaming. However, again, counsel elicited testimony from Mr. Berry that refuted his claim that he was able to see the front door of the victim's home from where he was standing. During the cross-examination of Mr. Berry, the following exchange took place:

Q. When you're standing by the fire pit outside of your clubhouse [i.e. the Nazi compound] can you see the door to Patricia Wells' house from there?

A. No.

Q. Okay. It's blocked, right?

A. That's right.

Despite the fact the record does not support the Defendant's claim that Mr. Berry testified to seeing the Defendant run from the victim's home, it is clear that his counsel established that it was nevertheless "physically impossible" for Mr. Berry to see the door to the victim's house from where he was standing. Based on counsel's cross-examination of these witnesses, contrary to the Defendant's claim, it is clear that counsel was well aware of the layout of the crime scene such that, on cross-examination, he was able to establish that these witnesses did not the vantage point they claim they had. For the aforementioned reasons, the Court finds that the Defendant has failed to establish that counsel was deficient pursuant to the first prong of *Strickland.*

(Doc. 13-22, Ex. 26, pp. 6856-59) (state court's record citations omitted) (emphasis and brackets in state court's order).

The state court did not unreasonably apply *Strickland* in denying this claim. As the state court set out in its order, counsel questioned Patnode and Berry about the layout of the scene and they agreed that they could not see the front door of Wells's trailer from their location. (Doc. 13-4, Ex. 4, pp. 1591-92, 1627-28, 1754-55.) Considering this testimony, DiTullio fails to show that counsel was ineffective in not photographing or documenting the scene to make the same point that counsel specifically addressed in front of the jury during cross-examination of the witnesses. DiTullio has not shown that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim. He is not entitled to relief on Ground Five.

## G.    Ground Six

DiTullio contends that trial counsel was ineffective in failing to request that the jury be polled after a juror received a threatening letter. During the trial, juror Nelson

41

told the court that he had received a threatening letter. (Doc. 13-4, Ex. 4, pp. 1926-37.) The court conducted an inquiry with juror Nelson, and he was excused from the jury. (*Id.*, pp. 1926-37, 1983-84.) DiTullio alleges that counsel should have requested a poll of the other jurors "to determine if any jurors had learned of the threatening letter." (Doc. 6, p. 13.)

The state court rejected DiTullio's ineffective assistance claim. When DiTullio filed his first postconviction motion, the state court found that his ineffective assistance claim was insufficiently pleaded because he did not allege prejudice under *Strickland*. (Doc. 13-22, Ex. 23, pp. 6780-81.) The state court then found that DiTullio's amended motion did not cure the identified pleading deficiency:

> The Court considered and continues to consider *the Defendant's request to interview the jurors*, a separate and distinct issue for consideration, from that of *the Defendant's specific allegation that counsel was ineffective for failing to interview the jurors* as a result of the threatening letter this juror received. Given the fact that the Defendant has, *in part*, presented this Court with an ineffective assistance of counsel claim, contrary to his claim, he must demonstrate that there is a reasonable probability that, but-for counsel's unprofessional errors, the outcome of the trial would have been different. *Haliburton*, 691 So.2d at 470. Again, in his amended motion, the Defendant goes into great detail concerning his "express" request to interview the jurors involved with this case, but fails to expound on his ineffective assistance of counsel claim. Given the fact the Defendant has failed to amend the portion of his ineffective assistance of counsel claim that he specifically made, said claim is denied with prejudice.

(Doc. 13-22, Ex. 26, p. 6860) (state court's record citations omitted) (emphasis in state court's order).

DiTullio does not show that the state court's denial of his ineffective assistance claim was unreasonable. The denial for failure to amend the claim to allege *Strickland*

prejudice was an adjudication of the claim on the merits. *See Borden v. Allen*, 646 F.3d 785, 808-16 (11th Cir. 2011) (examining a state postconviction court's rejection of a claim for failure to plead the claim with sufficient specificity and stating that the state court's "consideration of the sufficiency of the pleadings concerning a federal constitutional claim [in a postconviction motion] necessarily entails a determination on the merits of the underlying claim"); *Gaedtke v. Sec'y, Dep't of Corr.*, 369 F. App'x 12, 13-14, 16 n.2 (11th Cir. 2010) (stating that a state court's denial of an ineffective assistance claim as facially insufficient when the petitioner did not allege he was prejudiced and therefore "failed the prejudice prong of *Strickland*" was a denial on the merits entitled to deference under § 2254(d)(1)). DiTullio's amended postconviction motion did not allege that there was a reasonable probability the outcome of the proceeding would have been different had counsel moved to poll the jurors. (Doc. 13-22, Ex. 25, pp. 4-12.)

DiTullio also requested to interview the jurors, and as addressed in the state court's order, the state court considered this to be a "separate and distinct issue" from the ineffective assistance of trial counsel claim. DiTullio argues in his § 2254 petition that an interview of the remaining jurors was necessary to develop and argue prejudice regarding the ineffective assistance of counsel claim. To the extent he is therefore arguing that the denial of his distinct request to interview jurors was intertwined with his ineffective assistance claim, however, he cannot obtain federal habeas relief.

The state court denied DiTullio's request to interview jurors made in conjunction with his postconviction motion:

As to the Defendant's request to interview the jurors, the Defendant contends that he makes this request in order "to inquire whether any of the remaining jurors had been tainted and prejudiced by the Nelson letter and if so, then [the Defendant] was denied a fair trial and denied Due Process by such jurors serving on his jury." As the Defendant acknowledges in his amended motion, under Florida Rule of Criminal Procedure 3.575, a party who has reason to believe that the verdict may be subject to legal challenge can move the court for an order permitting an interview of the jurors to make that determination. However, *the rule restricts the ability to conduct juror interviews by requiring defendants to file the motion within 10 days after rendition of the verdict, unless good cause is shown for delay*. Fla. R. Crim. P. 3.575 (emphasis added). The jury rendered its verdict in this case on December 15, 2010, and years later, the Defendant is requesting that this Court permit him to interview the jurors. The Defendant's request is untimely and he has failed to allege good cause for the delay in bringing his request. *See Belcher v. State*, 9 So.3d 665, 666 (Fla. 1st DCA 2009) (finding that the defendant's motion for jury interview was time-barred when the record demonstrated that "defense counsel knew of possible juror misconduct by mid-February at the latest and did not raise the issue until March 30, 2006."). In this case, the record reflects that the Defendant was aware of the threatening letter Juror Nelson received during his second trial, which again, occurred in December of 2010; therefore, the claim should have been raised at that time. *See Diaz v. State*, 132 So.3d 93, 105 (Fla. 2013) (finding that the postconviction court did not err in denying the defendant's motion to interview jurors, because the claim was procedurally barred when the defendant failed to file the motion to interview the juror after the verdict was rendered and could have raised the issue on direct appeal); *Troy v. State*, 57 So.3d 828, 838 (Fla. 2011) (concluding substantive juror misconduct claims were procedurally barred because they "could have and should have been raised on direct appeal"); *Vining v. State*, 827 So.2d 201, 216 (Fla. 2002) (concluding motion to interview jurors claim was procedurally barred because it was not raised on direct appeal). To the extent the Defendant's claim is premised on the allegation that a motion to interview the jurors was not brought in a timely manner due to trial counsel's ineffectiveness, as noted above, the Defendant has failed to cure his ineffective assistance of counsel claim as previously directed by the Court.

Furthermore, "[a] motion for juror interview must set forth allegations that are not merely speculative or conclusory, or concern matters that inhere in the verdict." *Foster v. State*, 132 So. 3d 40, 65 (Fla. 2013). Here, the Defendant claims that "*[i]f any juror had heard of the threatening letter* it

would have been reversible error over [the Defendant's] objection to keep the juror on the panel." However, such a claim is speculative. Indeed, the Defendant's claim is based on the supposition that the other jurors actually learned of this threatening letter Juror Nelson received; however, there is nothing in the record to support such a claim. Furthermore, the record demonstrates that he letter Juror Nelson received had nothing to do with the Defendant or the facts of his case. The record reflects that after the Court learned of the letter Juror Nelson received, he was brought into court for questioning. When questioned by the Court, Juror Nelson indicated that upon receiving the letter and reading some of the threats contained therein, he Googled some of the names that were in the letter and used the word "Nazi" within the search. When questioned as to why he used the word "Nazi" in his Google search criteria, Juror Nelson acknowledged that even though the letter did not refer to his service as a juror, he assumed that the letter had something to do with his jury service. However, after turning the letter over to law enforcement, he learned that law enforcement was very familiar with the person who wrote the letter because this was a person who wrote threatening letters, like the one Juror Nelson received, to people all over the community and that the letter he received, turned out to be a "bizarre coincidence" that had nothing to do with his jury service or the Defendant's case. Juror Nelson also indicated that he only read a portion of the letter and that the portion of the letter he did read, did not mention the Defendant nor did it make mention to anyone involved with the Defendant's case. Furthermore, he indicated that he did not do any research concerning the Defendant's case, nor did he do any research on Nazis per se and that he only Googled the names contained in the letter along with the word "Nazi" and that the search did not return any substantive information. Moreover, the Court again notes there is nothing in the record to indicate that the other jurors learned of this letter. *See Anderson v. State*, 18 So.3d 501, 519 (Fla. 2009) ("Because there is no indication in the record that any of the shackles were perceptible to any members of the jury, we agree with the circuit court's decision and conclude that the court did not abuse its discretion in denying the motion. To have granted the motion would have allowed Anderson to conduct a 'fishing expedition' interview of the jurors, a practice which we have previously rejected."). Furthermore, the record reflects that after questioning Juror Nelson, both parties agreed that he should be dismissed and replaced with an alternate juror. The Court recognizes that when there are "allegations of influence upon the jurors' deliberations arising from an overt prejudicial act or external sources, such as . . . a juror receiving prejudicial information from outside the courtroom," a jury interview may be granted. *Aragon v. State*, 853 So.2d 584, 588 (Fla. 5th DCA 2003). However, the Florida Supreme

Court has held that "[j]uror interviews are not permissible unless the moving party has made sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceedings." *See, e.g.*, *Whitton v. State*, 161 So.3d 314, 332 (Fla. 2014), *reh'g denied* (Apr. 2, 2015). Here, the Court finds that the Defendant "has not sufficiently alleged any fact which involves an overt prejudicial act that would necessitate a new trial." *Reaves v. State*, 826 So.2d 932, 943-44 (Fla. 2002).

(Doc. 13-22, Ex. 26, pp. 6860-62) (state court's record citations omitted) (emphasis and brackets in state court's order).

Whether DiTullio's request to interview jurors during state court postconviction proceedings to develop his ineffective assistance claim should have been granted turns on a question of state law. This Court defers to the state court's determination that the request was untimely and without merit under state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (stating that the Supreme Court "repeatedly has held that state courts are the ultimate expositors of state law"); *McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir. 1992) ("A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved.").

Furthermore, DiTullio's assertions about what an interview of the jurors might have uncovered are too speculative to warrant federal habeas relief. *See, e.g.*, *Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) ("As we have explained, '[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.' " (quoting *Aldrich*, 777 F.2d at

636)); *Raulerson v. Wainwright*, 753 F.2d 869, 876 (11th Cir. 1985) (stating that a habeas court does not simply "accept speculative and inconcrete claims").

Finally, DiTullio seeks permission from this Court to interview jurors in order to show that he was prejudiced by trial counsel's failure to move to poll the jurors. The Court cannot grant DiTullio's request because it is bound by the record that was before the state court when it decided DiTullio's claim. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."); *Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015) ("*Pinholster*'s holding governs only claims brought under § 2254(d)(1), but its logic applies even more clearly to § 2254(d)(2) which contains an explicit textual restriction to evaluate the state court ruling only in light of the evidence presented in the State court proceeding.") (internal quotation marks omitted). DiTullio is not entitled to relief on Ground Six.

## H.    Ground Seven

DiTullio asserts that trial counsel was ineffective in failing to present expert testimony that the knife the State contended DiTullio used to commit the offenses was unlikely to have caused the victims' injuries. The state court denied this claim:

> [T]he Defendant claims counsel was ineffective for failing to present "expert testimony to show that it was unlikely that the purported murder weapon in fact could have caused the fatal injury." According to the Defendant, State witness, John Berry, testified during the second trial that he accompanied the Defendant on the night of the murder, when the Defendant buried a knife that was "presented as the murder weapon." According to the Defendant, prior to the start of the second trial, Mr. Berry showed law enforcement where the knife was buried, and this knife "was tied together with evidence of a poem written by [the Defendant]

while in jail that appeared to implicitly confirm [Mr.] Berry's story about the knife." The Defendant claims his counsel should have hired an expert to refute Mr. Berry's testimony and show that the knife Mr. Berry led the police to, "was not the likely murder weapon." According to the Defendant, "[s]uch an expert would have been available and would have so testified and had he done so, the outcome of the trial would have been different."

As noted above, when alleging that counsel should have called an expert witness, a defendant does not need to name a specific expert or allege that the expert was available to testify. *See Lucas*, 41 Fla. L. Weekly S19; *see also Terrell*, 9 So.3d at 1284. Moreover, as noted above, although there is "no authority requiring the defendant to provide the name of a particular expert," the Defendant must assert the expert's field of expertise and the Defendant must still set forth the substance of the prospective witness' testimony and explain how the omission of the testimony prejudiced the outcome of the trial. *Terrell*, 9 So.3d at 1284; *see Barthel*, 882 So.2d at 1055 (citing *Nelson*, 875 So.2d at 583-84).

. . .

In his amended motion, the Defendant attached two curriculum vitae from individuals who appear to be experts in the field of forensics; therefore, it appears the Defendant is claiming this expert's field of expertise is that of the field of forensics. In his amended motion, the defendant also provides the Court with details on what these forensic experts would have testified to had counsel called them to testify during the trial. Specifically, the Defendant claims that the experts would have testified that the knife presented during the trial "failed to give chemical indications for the presence of blood." The Defendant then goes on to point to the fact that the surviving victim in this case, Patricia Wells, allegedly provided a physical description of the knife, that was inconsistent with "the putative murder weapon the State presented" during the course of the trial. According to the Defendant, had counsel called an expert in the field of forensics, said expert would have been able to "opine that the weapon in question is unlikely to have been the murder weapon," based on these inconsistences.
. . .

The Court continues to find that the Defendant cannot demonstrate that counsel was ineffective for failing to call this witness, when he affirmed, under oath that the did not wish to have any other witnesses called. . . .

48

Notwithstanding the foregoing, even if the Court were to find that counsel was deficient in failing to call a forensic expert "to show that it was unlikely that the purported murder weapon in fact could have caused the fatal injury," the Defendant cannot demonstrate that he was prejudiced. One of the things that the Defendant claims this expert or experts would have testified about is that the knife presented during the trial "failed to give chemical indications for the presence of blood." However, as the State points out, this testimony was already presented to the jury. After the direct-examination and cross-examination of Detective Jennifer Christensen, the jury had an opportunity to ask questions, one of which focused on the knife that was found in this case. The question was whether the knife that was found, was ever tested for blood or anything, and if so, whether anything was found. Ms. Christensen responded by testifying that the knife was in fact tested, but nothing was found, in fact she testified, "[i]t was negative." The Court would also note that, counsel for the Defendant brought up this very fact to the jury during closing argument.

The Defendant also points to the fact that the surviving victim in this case, Ms. Wells, provided inconsistent testimony concerning the physical description of the knife. He claims had counsel called an expert in the field of forensics, this expert would have been able to "opine that the weapon in question is unlikely to have been the murder weapon," based on these inconsistencies. A forensic expert called on behalf of the defense did not need to be called to specifically opine in this regard. As the State points out, the fact that the victim did not get a very good look at the knife and seeming inconsistencies in her testimony were revealed when she testified at the trial. The defense was able to use the victim's testimony to its benefit during closing arguments by arguing that the knife, as described by the victim, was inconsistent with the knife actually presented at trial, and argued rather forthrightly, that the knife presented at trial, was not the murder weapon.

Furthermore, as the State aptly points out, the State Medical Examiner, Dr. Jon Thogmartin acknowledged that the knife presented at trial merely *could have been* the murder weapon. The Defendant seeks to minimize the import of the fact that the Medical Examiner in this case never stated, definitively, that the knife presented at trial was in fact the murder weapon, by claiming that Dr. Thogmartin's acknowledgment was made "grudgingly;" however, he offers no support for such a conclusory claim. Incidentally, even if the acknowledgment was done "grudgingly," that does not negate the fact that the acknowledgement was in fact made. The Court would also note that a thorough review of

49

the record indicates that, contrary to the Defendant's claim, Dr. Thogmartin's acknowledgment was not made "grudgingly." The record demonstrates that on direct-examination, in response to a question about what type of object could have caused the injuries to the victim Kristofer King, *without hesitation*, Dr. Thogmartin indicated that the weapon used was edged, and that while one would "most typically think of a knife . . . it could be other things, not necessarily a knife." Certainly, it would not have been in the State's interest to force Dr. Thogmartin to answer in a rather non-committal manner, especially when the State's theory was that the knife introduced into evidence was the actual murder weapon. The Court would also note that upon cross-examination, Dr. Thogmartin was just as forthcoming in acknowledging the fact that the knife he was presented with at trial *merely could have been the murder weapon*. There was no reluctance in his response. Indeed, in response to one of the first questions from counsel for the Defendant concerning the knife, Dr. Thogmartin affirmed that he testified the knife that he was presented with at trial *could have been the murder weapon*, adding, "*along with a lot of other different knives.*" Dr. Thogmartin's forthcoming testimony continued when juror questions were posed to him concerning the knife, one of which focused on whether two different knives could have caused the wounds on victim King, to which Dr. Thogmartin responded that they could have been from two knives and that he could not "tell you for sure none of the wounds are definitely from a second knife or a third knife or a fourth knife . . . [t]hey can all be from one knife or they can be from more than one. I have no way of telling for sure." Counsel for the Defendant used Dr. Thogmartin's testimony to his advantage during closing argument, arguing, in pertinent part, as follows:

> I would suggest to you that it is not the murder weapon. Now, the medical examiner said it could be, or it could be a piece of glass that could have caused it, it could have been a multitude of objections [sic] that could have caused this.

There is nothing about Dr. Thogmartin's testimony that would warrant dismissal of it as the Defendant suggests should be done in his motion.

The Defendant also claims that this expert would have been able to essentially compare the physical description of the weapon as described by victim Wells versus the physical description of the knife actually presented at trial to provide an opinion that the knife at trial was not the murder weapon. However, the record reflects that even in the absence of this excerpt [sic], counsel was able to make the comparison. First, during the cross-examination of Dr. Thogmartin, counsel for the Defendant

asked the doctor a series of questions about the physical characteristics of the alleged murder weapon. Next, during the defense's case-in-chief, the surviving victim Ms. Wells was called as a witness. During the direct-examination of Ms. Wells, all but three of the questions focused on Ms. Well's description of the knife. Using the information he obtained during these examinations, during closing arguments, counsel for the Defendant was able to make the following comparison argument concerning the knife:

> I would suggest to you that it is not consistent, the little knife that you saw up here earlier in the week, it's not consistent with the description provided by Patricia Wells of the murder weapon, because Patricia Wells describes the knife as a double-bladed knife."
> (. . .)
>
> There's a lot of back and forth about it, but the bottom line was, when it came down to it, [Patricia Wells] knew what a double-bladed knife was, one with blades on both sides. Take a look at the knife that's been introduced. It's not the knife.

Contrary to the Defendant's claim, an expert was not needed to make this comparison. Counsel for the Defendant effectively questioned both Dr. Thogmartin about the physical description of the knife compared to the wounds inflicted on victim King. Likewise, counsel effectively questioned Ms. Wells about the physical description of the knife she saw on the evening she was attacked. Based on the testimony counsel was able to elicit, counsel was able to make the comparison during closing arguments.

As to the Defendant's claim that this expert would have been the only one who could have provided the necessary testimony to demonstrate that the knife was "figuratively and literally placed in [the Defendant's] hand as the murder weapon by a clever combination of stacked inferences," the Court is not persuaded that a forensic expert was required to make such an argument. Notwithstanding the dubious nature of the Defendant's claim on this point, even without this forensic expert's testimony, counsel for the Defendant was still able to point out to the jury that Mr. Berry only came forward with his allegation, that the Defendant buried the knife after he had been incarcerated and that the knife was "probably a knife that John Berry put [in the well] at some point, for whatever reason we don't know."

Not only did the Defendant affirm, under oath, that the did not wish to have any other witnesses called on his behalf, but the Court finds that, even in the absence of this expert, the same evidence the Defendant claims only this expert would have been able to provide, was already presented to the jury.

 (Doc. 13-23, Ex. 29, pp. 7153-59) (state court's record citations and footnote omitted) (emphasis and brackets in state court's order).

DiTullio does not establish that the state court's denial of his claim was objectively unreasonable. Initially, as addressed in other grounds, given that DiTullio agreed with counsel's presumptively reasonable strategic decision not to call other witnesses, he does not show that the state court unreasonably found that he failed to establish deficient performance. *See Hammond*, 586 F.3d at 1327-28; *Acuna*, 494 F. App'x at 962-63.

Moreover, as the state court's order explained in great detail, the jury heard evidence that raised a question as to whether the recovered knife was indeed the knife used in the offenses. The jury heard testimony that the knife was tested for blood, but none was found. (Doc. 13-4, Ex. 4, p. 1793.) Dr. Thogmartin could not say with certainty that the knife in evidence was in fact the knife used to commit the crimes, and in response to a juror's question, he agreed that it was possible the wounds could have been caused by two different knives. (*Id.*, pp. 1692-93, 1695-97, 1703-04.) Additionally, the jury was aware that Wells made inconsistent statements about whether the knife she saw had a single or double blade. (Doc. 13-5, Ex. 4, pp. 2300-09, 2312.) Wells also testified that she did not look at the knife for long, as she

immediately began to run away from the perpetrator and was trying to protect herself. (Doc. 13-4, Ex. 4, pp. 1096-1099; Doc. 13-5, Ex. 4, pp. 2300-09.) Counsel argued to the jury that the evidence showed the knife in evidence was not the murder weapon. (Doc. 13-5, Ex. 5, pp. 2616-17, 2625-26.)

DiTullio does not show a reasonable probability of a different outcome at trial had a defense expert offered testimony reiterating the evidence already before the jury. In addition, his claim is too speculative to warrant federal habeas relief because he does not identify the prospective witness, present evidence that such a witness would have testified as he theorizes, or assert that counsel had retained such a witness. *See Johnson*, 256 F.3d at 1187; *Tejada*, 941 F.2d at 1559; *Shaw*, 729 F. App'x at 759.

Because DiTullio does not show that the state court's denial of his claim involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination, he is not entitled to relief on Ground Seven.

## I.    Ground Eight

DiTullio argues that the cumulative effect of trial counsel's alleged errors entitle him to relief. The state court denied this claim, stating that "where the alleged errors urged for consideration in a cumulative error analysis are individually either procedurally barred or without merit, the claim of cumulative error also necessarily fails." (Doc. 13-23, Ex. 29, p. 7159.) DiTullio does not show that the state court's finding was contrary to, or involved an unreasonable application of, clearly established federal law. *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012)

(stating that when none of the individual claims of error have merit, "we have nothing to accumulate"). DiTullio is not entitled to relief on Ground Eight.

J.    **Evidentiary Hearing**

In his memorandum, DiTullio requests an evidentiary hearing on Grounds One through Seven. An evidentiary hearing is not warranted. *See Schriro*, 550 U.S. at 474 (stating that "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing"); *Landers*, 776 F.3d at 1295 ("[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record.").

It is therefore **ORDERED** that DiTullio's amended petition (Doc. 6) is **DENIED**. The **CLERK** is directed to enter judgment against DiTullio and to **CLOSE** this case.

<u>Certificate Of Appealability</u>
<u>And Leave To Appeal *In Forma Pauperis* Denied</u>

It is further **ORDERED** that DiTullio is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a COA must first issue. *Id*. "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id*. at § 2253(c)(2). To obtain a COA, DiTullio must show that reasonable jurists would find debatable

both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). DiTullio has not made the requisite showing. Finally, because DiTullio is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**ORDERED** in Tampa, Florida, on September 26, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE